**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re MICROBILT CORP., | : | |
| | : | Bankruptcy Action. No. 11-18143 (MBK) |
| Debtor, | : | |
| | : | |
|  | : | |
| CHEX SYSTEMS, INC., | : | **ON APPEAL FROM THE** |
| | : | **BANKRUPTCY COURT OF THE** |
| Appellant, | : | **DISTRICT OF NEW JERSEY** |
| | : | |
| v. | : | **Civil Action No. 12-4132 (MAS)** |
| | : | |
| MICROBILT CORP., | : | **MEMORANDUM OPINION** |
| | : | |
| Appellee. | : | |

**SHIPP, District Judge**

### I.   Introduction

Appellant Chex Systems, Inc. ("Appellant" or "Chex") appeals an Order entered by the Bankruptcy Court on May 16, 2012 ("May 16 Order"). That Order memorialized the Bankruptcy Court's oral opinion issued on April 18, 2012 ("April 18 Opinion"). (APP31-94.) The April 18 Opinion adjudicated two motions (the "Assumption Motions") filed by the Parties, both of which sought, to different extents, to settle the terms of a Resale Agreement between the Parties and allow Appellee MicroBilt, Corp. ("Appellee" or "MicroBilt"), to assume a Resale Agreement the Parties had previously entered. The April 18 Opinion outlined several conclusions: 1) the Resale Agreement was ambiguous as to the amounts MicroBilt was required to pay Chex for information it was provided pursuant to the Resale Agreement; 2) due to that ambiguity, the Bankruptcy Court supplied pricing terms it determined were consistent with the intent of the

Parties; and 3) the Bankruptcy Court found that the allegations of default alleged by Chex were either not supported by the facts or were immaterial to the Resale Agreement. Chex alleges that the factual findings of the Bankruptcy Court were clearly erroneous and its legal conclusions constituted manifest errors of law. After careful consideration, and for the reasons set forth below, the Court AFFIRMS the findings and determinations of the Bankruptcy Court in part, REVERSES in part and REMANDS for further proceedings consistent with this Opinion.[1]

## II.     Jurisdiction and Standard of Review

United States District Courts have jurisdiction to review appeals "from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." 28 U.S.C. § 158(a)(1-3). The District Court sits "as an appellate tribunal, appl[ying] a clearly erroneous standard to review the bankruptcy court's factual findings and a *de novo* standard to review its conclusions of law." *In re Blatstein*, 260 B.R. 698, 705 (E.D. Pa. 2001) (citing *In re Siciliano*, 13 F.3d 748, 750 (3d Cir. 1994)). The Court is required to "break down mixed questions of law and fact, applying the appropriate standard to each component." *Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992) (citation omitted).

A factual finding "is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). If it is alleged that the bankruptcy court abused its discretionary authority, "the district court may only

---

[1] Chex filed an additional appeal docketed as 12-7293 on November 27, 2012. For the reasons stated below, that appeal is granted and the determination of the Bankruptcy Court is reversed. The Court will limit its discussion of this issue and merely note that the unambiguous language of the Resale Agreement requires that the volume discounts in paragraph three of the Pricing Attachment only apply to the end uses outlined in the Online Data Pricing Schedule. Pricing for uses which fall under the Debit Price Schedule (*e.g.* payday lending, tenant screening) are controlled solely by the volume pricing scheme in the Debit Price Schedule.

determine whether . . . the [lower] court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *Blatstein*, 260 B.R. at 705 (alteration in original) (citing *In re Top Grade Sausage*, 227 F.3d 123, 125 (3d Cir. 2000); quoting *Int'l Union, UAW v. Mack Trucks, Inc.*, 820 F.2d 91, 95 (3d Cir. 1987)).

## III. Background

Debtor MicroBilt is a consumer reporting agency that provides information to lenders that service the non-traditional or alternative lending markets, such as "lenders who make loans to consumers who have no credit files[,] . . . thin credit files or stale credit files." (APP40.) Typical end users of MicroBilt's product include pay-day lenders, collection agencies, landlords performing tenant screenings and lenders providing unsecured loans. (APP67.) Pay-day lenders make up roughly 50 percent of MicroBilt's end users. (APP65.) Chex provides MicroBilt with information integral to the product that MicroBilt provides to its customers. (APP40.) Without access to Chex's information, MicroBilt would not be able to "perform its obligations to its end user[s]." (*Id.*)

### A. The Information Resale Agreement

MicroBilt and Chex were parties to a resale agreement which was terminated by Chex in October 2008. (APP41.) MicroBilt, unable to provide its product to its end users, sued Chex for wrongful termination. (*Id.*) That suit culminated in mediation held before the Honorable John M. Hughes, U.S.M.J. (Ret.), in June 2009. (*Id.*) That mediation, in turn, resulted in a Memorandum of Understanding (the "Memorandum") between the Parties and an eventual agreement between the Parties: the Information Resale Agreement (the "Agreement"). (*Id.*) The Agreement was finalized on August 26, 2009. (MicroBilt Br. 13.) Unsurprisingly, the Parties have differing versions of events that occurred at the mediation and during the negotiation of the Agreement.

3

Those disagreements, and more importantly the Bankruptcy Judge's factual findings resolving them, are discussed in further detail below. The most basic and uncontroverted facts about those events and the Agreement are as follows. Prior to the mediation, MicroBilt was more properly considered a reseller, in whole form, of the information that it acquired from Chex. (APP41.) During the mediation, MicroBilt made it known to Chex that it intended to use Chex's data as a component of a new product that was based upon the "FICO Expansion Score," which it was in the process of purchasing the rights to from Fair Isaac, Inc.[2] (*Id.*) MicroBilt's new product would be known as "PRBC with FICO Expansion" (the "Merged Report").

The Agreement contains several attachments, the most important of which is Attachment 1 (the "Pricing Attachment"). (APP1691-93.) The Pricing Attachment states that the information MicroBilt purchased from Chex "shall only be provided to End Users in the following industries or markets: [1] pay-day lending; [2] telecommunications; [3] tenant screening; [4] auto loans; [5] unsecured loans, [6] credit cards, [7] mortgage origination application transactions; and [8] first and third-party account review and collections." (APP1691.)

The Pricing Attachment also contains two pricing schedules: "1. Debit Report Service Fees" ("Debit Price Schedule"), and "2. Online Data Royalty" ("Online Data Price Schedule"). (APP1691-1692.) The prices contained in the two fee schedules are materially different in both monetary value (price per record) and the manner in which they are calculated (whether MicroBilt was forced to pay "per inquiry" or "per Matched Record"). (*Id.*; APP63.) Moreover, the Online Data Price Schedule enumerates pricing for four of the discrete end user types that MicroBilt was permitted to sell the information it purchased from Chex to: 1) Mortgage

---

[2] Fair Isaac is the creator and owner of the FICO credit score commonly used by banks and financial institutions. It changed its name to FICO, Inc. in March 2009. *See* "Fair Isaac is Now FICO," *available at* http://www.fico.com/en/Company/News/Pages/03-10-2009.aspx.

Origination, 2) Installment Origination, 3) Credit Card Origination, and 4) Direct to Consumer Offerings. (APP1692.) The Debit Price Schedule does not contain specific end uses. (APP1691.)

MicroBilt alleges that it sought, and secured, pricing for the information it obtained from Chex based upon *the product* in which MicroBilt used the information. (MicroBilt Br. 10.) If MicroBilt were to resell the information in whole form, the Debit Price Schedule would apply. (*Id.* at 10-11.) If MicroBilt were to resell the information as a component of its new product, the Merged Report, the Online Data Price Schedule, which was based upon the prices that Fair Isaac had previously paid for Chex's information, would apply regardless of the end user. *Id.*

Chex alleges that the price would be driven by the *identity of the end user* that MicroBilt supplied the information to, *regardless of the product or form* that MicroBilt sold the information. (Chex Br. 14.) Specifically, the only times the pricing in the Online Data Pricing Schedule would apply was when the end user that MicroBilt was supplying engaged in four distinct activities: 1) Mortgage Origination, 2) Installment Origination, 3) Credit Card Origination, and 4) Direct to Consumer Offerings. (Chex Br. 21-22.) Otherwise, the Debit Pricing Schedule would apply. (*Id.*) The Bankruptcy Court substantially resolved this issue in favor of MicroBilt. (APP66-67.) A detailed discussion follows.

**B.**     **MicroBilt's Alleged Default Under the Agreement**

Following consummation of the Agreement, Chex sent a series of letters alleging that MicroBilt was in breach of the Agreement and that it would seek to terminate the Agreement. (APP43.) Specifically, on November 11, 2010, Chex notified MicroBilt that it was in default of paragraphs 9, 19(a) and 20(c) of the Agreement due to MicroBilt's "failure to: [1] properly validate, i.e. credential its end users, [2] provide Chex with end user account records in accordance with the Chex data contribution policy, and [3] respond to Chex's audit request for full credentialing files of certain debtor's end users." (*Id.*) During the course of the proceedings

5

before the Bankruptcy Court, Chex also alleged that MicroBilt was in default regarding a fourth provision: paragraph 6(c) of the Agreement, which prohibits "use" of information provided by Chex to end users not located in the United States. (Chex Br. 26; APP80-81; APP123-124.)

The Bankruptcy Court would eventually determine all of these issues in MicroBilt's favor. First, although MicroBilt was in breach of the duty to provide credentialing information, it was in a position to cure that default and was ordered to do so.[3] (APP56-57.) Second, regarding Chex's Data Contribution Policy, the Court found that MicroBilt only needed to provide "fraud data" to Chex. (APP54-55.) MicroBilt had failed to provide such information but was in a position to cure that default and was ordered to do so. Third, the Bankruptcy Court "excised" the audit provision from the Agreement as "not economically significant" to the Parties and determined that MicroBilt therefore could not be in default. (APP58-60.) Finally, the Bankruptcy Court determined that MicroBilt was not in breach of Section 6(c) because no "information was being supplied outside of the United States" and MicroBilt was not providing any data to a Canadian customer. (APP123.) Rather, MicroBilt was providing the Canadian customer with an "interpretation of the data." (*Id.*)

### C.   Relevant Procedural History

MicroBilt filed for relief under Chapter 11 of the United States Bankruptcy Code (the "Code") on March 18, 2011. Chex filed a "Motion to Compel Assumption/Rejection" of the Agreement on April 5, 2011. (11-18143 Bankruptcy ECF No. 46.) MicroBilt responded with its own "Motion to Assume" the Agreement on April 21, 2011. (11-18143 Bankruptcy ECF No. 67.) Following briefing on the matter, the Bankruptcy Court held a four day trial on January 26-27, 2012, and February 2-3, 2012. (APP36.) The Bankruptcy Court rendered an oral decision on

---

[3] Chex did not appeal this issue.

the assumption motions on April 18, 2012. (APP31.) That oral opinion was incorporated into a written order on May 16, 2012. (APP20.)

Chex filed a motion for reconsideration of the April 18 Opinion on May 1, 2012. (11-18143 Bankruptcy ECF No. 419.) That motion was also fully briefed and oral argument occurred on May 21, 2012. (APP102.) Chex's Motion was denied. (APP100.) An order to that effect was entered on July 7, 2012. (APP99-100.)

Chex filed a Notice of Appeal of the Bankruptcy Court's denial of its Motion to Compel Assumption/Rejection on July 6, 2012. (ECF No. 1.)

### D.     Issues on Appeal

Chex has appealed several issues resolved by the Bankruptcy Court. They are as follows:

**1)     The Pricing Attachment** — Chex appeals the Bankruptcy Court's factual findings and legal conclusions regarding the pricing structure utilized in the Agreement. More specifically, Chex states that the Bankruptcy Court's factual finding that the Parties intended that the pricing structure to be applied would be driven by the *product* that MicroBilt sold, rather than the *end user type* that MicroBilt was selling its Merged Report to, was clearly erroneous and unsupported by the record. (Chex Br. 2.) Chex further disagrees with the Bankruptcy Court's legal determination that, having found that the Parties sought to use the Online Data Price Schedule anytime MicroBilt used Chex's information as part of the Merged Report, it was required to insert new prices into the Agreement. (*Id.*)

**2)     MicroBilt's Relationship with a Canadian Customer** — Chex contends that the Bankruptcy Court erred when it concluded that MicroBilt was not in default under the Agreement even though MicroBilt was reselling "information" procured from Chex to Northway Brokers, LTD ("Northway"), a Canadian customer, under Section 6(c) of the Agreement. (*Id.* at 3.) This issue includes both a legal and factual component. First, the Bankruptcy Court was

7

required to factually determine what was being sold to Northway. Second, it was required to legally determine whether the product/information being sold to Northway breached the Agreement. Chex contends both of the Bankruptcy Court's conclusions were erroneous. (*Id.*)

      **3)**      **The Bankruptcy Court's Conclusion Regarding the Audit Provision** — Chex appeals the Bankruptcy Court's legal determination that the audit provision in Section 20 of the Agreement was not "economically significant" to the Parties and should be excised from the Agreement. (*Id.*)

      **4)**      **The Bankruptcy Court's Conclusion Regarding Chex's Data Contribution Policy** — Chex appeals the Bankruptcy Court's determination that the Agreement only required MicroBilt to provide "fraud data" associated with end user account records, rather than provide the entire end user account record. (*Id.* at 3-4.)

## IV.    Legal Standard for a Motion to Assume Executory Contract

Section 365(a) of the Bankruptcy Code (the "Code") states that a trustee "may assume or reject any executory contract . . . of the debtor." 11 U.S.C. § 365(a). Section 365 "allows the trustee to maximize the value of the debtor's estate by assuming executory contracts . . . that benefit the estate and rejecting those that do not." *In re Fleming Cos., Inc.*, 499 F.3d 300, 304 (3d Cir. 2007) (citing *Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001)) (internal quotation marks omitted). An executory contract may not be assumed until the debtor/trustee: "(1) cures or provides adequate assurance that it will promptly cure the default; (2) compensates or provides adequate assurance of prompt future compensation for actual pecuniary loss resulting from the default; and (3) provides adequate assurance of future performance under the contract or lease." *In re Rickel Home Ctrs., Inc.*, 209 F.3d 291, 298 (3d Cir. 2000) (citing 11 U.S.C. § 365(b)(1)). A bankruptcy court authorizing assumptions of executory contracts must be sensitive to the rights of the non-debtor contracting party and the policy requiring that the non-debtor

8

receive the full benefit of his bargain. *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1091 (3d Cir. 1990).

Although "the bankruptcy court has discretion to excise or waive a bargained-for element of a contract . . . [,] the modification of a contracting party's rights is not to be taken lightly." *Fleming Cos.*, 499 F.3d at 305 (citing (quotation marks omitted); *Joshua Slocum*, 922 F.2d at 1091.

## V.    Guiding Principles of Contract Interpretation

The Parties agree that Delaware law controls the interpretation of the Agreement. (*See* Chex Br. 30; MicroBilt Br. 37.) A contract is "ambiguous" only when "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 565 (D. Del. 1993) (quoting *Rhone-Poulenc v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)). Any judicial interpretation of the Agreement must seek to effectuate the mutual understanding of the Parties at the time the Agreement was entered into and consistent with the terms of the Agreement. *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("When the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity. Then the interpreting court must look beyond the language of the contract to ascertain the parties' intentions."). When the language of the Agreement is unambiguous, it is controlling. *Id.* "Delaware follows the well-established principle that in construing a contract a court cannot in effect rewrite it or supply omitted provisions." *Rockwell v. Rockwell*, 681 A.2d 1017, 1021 (Del. 1996) (quoting *Gertrude L.Q. v. Stephen P.Q.*, 466 A.2d 1213, 1217 (Del. 1983)). It is not the duty of the Court to make a better contract for the Parties than the express language of the Agreement provides. *James v.*

9

*Getty Oil Co. (E. Operations), Inc.*, 472 A.2d 33, 39 (Del. Super. 1983) (citing *Hajoca Corp. v. Sec. Trust Co.*, 25 A.2d 378, 383 (Del. Super. 1942)).

## VI.    Analysis

### A.    The Bankruptcy Court's Pricing Structure Determinations are Reversed

#### 1)    The Bankruptcy Court's Findings

Chex appeals the findings of the Bankruptcy Court regarding the pricing structure contained in the Agreement. Critical to the Court's analysis of the issues presented on the appeal is the applicable standard of review. As noted above, the Bankruptcy Court's factual determinations are reviewed for "clear error" and its legal conclusions are reviewed *de novo*. *Blatstein*, 260 B.R. at 705. Chex alleges that the "Bankruptcy Court Committed a Manifest Error of Law When It Concluded that It Needed to Imply Prices into Attachment 1." (Chex Br. 31.) Critical to the Bankruptcy Court's determination that it was required to insert pricing terms into the Agreement were two erroneous factual conclusions: 1) that Chex sold two products to MicroBilt, and 2) that the type of product MicroBilt used Chex's data in determined which pricing structure applied. (APP66-67.)

The Bankruptcy Court, in its April 18 Opinion, found that:

> To the extent MicroBilt utilizes and purchases debit reports, it is clear that, under Attachment 1, the pricing in [the Debit Price Schedule] . . . must apply. However, to the extent MicroBilt is not purchasing that product, a debit report, the pricing from [the Online Data Pricing Schedule] with respect to online data royalties would apply and the Court finds that it's the parties' intent to utilize to the extent possible the pricing table contained in [the Online Data Pricing Schedule].

(*Id.*)

This finding indicates that, at least for purposes of the April 18 Opinion, the Bankruptcy Court thought the *nature of the product sold to MicroBilt*, rather than the end user, was the factor which the Parties intended to determine pricing. Because the pricing schedule for the Online

10

Data Pricing Schedule did not include pricing for several types of end users, the Bankruptcy Court was left "the unenviable task of supplying an omitted term to try to honor the parties' reasonable expectation with respect" to the prices to be charged for the end users not specifically listed in the Online Data Pricing Schedule. (APP67.) The Bankruptcy Court, pursuant to its equitable powers, then determined the prices Chex was to charge MicroBilt when the end user was a payday lender, collections agency, tenant screener or a lender offering unsecured loans. (*Id.*)

The matter was explored more fully during oral argument on Chex's motion for reconsideration[4] of the April 18 Opinion. There, Chex and the Bankruptcy Court had the following lengthy colloquy:

> **Chex**:  Your Honor ruled that where [MicroBilt] was purchasing debit report it had to pay the price that was in [the Debit Price Schedule] . . . [a]nd then if there were other sales of other information . . . it should be charged the pricing in [the Online Data Price Schedule]. Your Honor, we think that Your Honor's ruling would nullify [the Online Data Price Schedule] because we don't sell anything other than debit report.

> **Bankruptcy Court**:  Well, let me ask a question, then . . . [w]hen would [the Online Data Price Schedule] come into play?

> **Chex**:  [The Online Data Price Schedule] would come into play specifically when the debit report was utilized for those specific uses [1) Mortgage Origination, 2) Installment Origination, 3) Credit Card Origination, and 4) Direct to Consumer Offerings] that were outlined in [the Online Data Price Schedule].

> . . .

> **Bankruptcy Court**:  If what you're saying is [the Online Data Pricing Schedule] still applies to debit report, . . . why have it . . . under a separate heading called online data royalty? Why wouldn't it just be under [the Debit Price Schedule]? Why are there two paragraphs?

---

[4] The Court chooses to cite to the Motion for Reconsideration Hearing because it more clearly evinces the factual and legal reasoning of the Bankruptcy Court, as opposed to the April 18 Opinion, which did not cite the record.

**Chex**: Well, Your Honor, I think that's addressed by even Your Honor's notation [in the April 18 Opinion] that [the pricing structure in the Agreement] was sloppily cut from the FICO contract and just dumped into this contract.

. . .

**Bankruptcy Court**: What end user . . . would not qualify for [the Online Data Pricing Schedule] but for [the Debit Price Schedule]? What type of user?

**Chex**: Any end user that was not otherwise a mortgage originator, a credit card originator, or an installment loan originator [and we] . . . would essentially write out directed consumer offerings.

. . .

**Bankruptcy Court**: So, for clarification, Chex's position is that the [Online Data Pricing Schedule] is not meant to apply to any of the uses . . . that are reflected in the general paragraph that appears under resale limitations, in other words, telecommunications, payday lending, auto loans . . . that would all be [covered by the Debit Price Schedule]?

**Chex**: That's correct . . . again, it's important because the debtor only purchases debit report.

. . .

**Chex**: So really what we're left with is well, where does payday loan fall? . . . The only codes that debtor submitted were account review, debit/credit issuance, collections. Your Honor . . . those codes specifically track to a general usage of the debit report and fall within [the Debit Price Schedule]. . . . With that, Your Honor, there was really no need for Your Honor to undertake the unenviable task[,] as Your Honor put it[,] to identify additional prices because the parties did not forget to include pricing. In fact, Your Honor, Chex's position all along as confirmed by Mr. Bjerke, [is that] where . . . the debtor was purchasing a debit report for those specific uses that are outlined in [the Online Data Pricing Schedule], mortgage origination, installment loan origination, installment loan origination, credit card issuance, that they would receive the reduced pricing. Otherwise they received the pricing that is [in the Debit Price Schedule].

. . .

**Bankruptcy Court**: Does Chex sell consumer report information apart from debit report?

**Chex**: It does not, Your Honor.

**Bankruptcy Court**: Then why is [the Online Data Pricing Schedule] there?

**Chex**: [T]hat's a very good question, Your Honor.

(APP107-110.)

**Bankruptcy Court**: [D]o other resellers purchase and resell the debit report in total?

**Chex**: Yes. They all do.

**Bankruptcy Court**: Complete without any additions?

**Chex**: Oh, I don't know. We don't know Your Honor. That's . . . really irrelevant to us [as long as] it's used according to FCRA purposes – what they do with it after they get it doesn't really matter to us other than to make sure it's being priced the right way . . . . Again, if they're using it for a credit card issuance or a mortgage origination or an installment loan and they properly code it to use that way, they would get the pricing in [the Online Data Pricing Schedule]. Otherwise they get the pricing in [the Debit Price Schedule] . . . .

(APP112.)

**Bankruptcy Court**: Let me ask another question.

**Chex**: Yes, Your Honor.

**Bankruptcy Court**: I think the parties and counsel could tell that I struggle with reading these documents.

**Chex**: I appreciate that, Your Honor. We struggled with it unfortunately I think longer than Your Honor.

**Bankruptcy Court**: Yes you have . . . . [W]hat is an online data request and how does that differ from a debit report?

**Chex**: It – it doesn't, Your Honor. And unfortunately . . . this was a situation where [the Parties] cut a section of [the CHEX/FICO contract] that was written differently than this resale agreement and dumped it into this resale agreement. Your Honor, we've only ever sold debit report.

(APP113-14.)

The Bankruptcy Court also engaged in a colloquy with counsel for MicroBilt. MicroBilt argued that the Bankruptcy Court's previous opinion, which found that it was MicroBilt's intent, as well as the Parties', to utilize the Online Data Pricing Schedule once MicroBilt had begun

13

selling the Merged Report, was reasonable. (APP116, 55:17-56:23; APP117 59:21-60:9.) The

following is also telling:

> **Bankruptcy Court**: And since ultimately the Court had to determine the intent of the parties underlying the agreement, Chex's position is we sold debit report. Debit report consists of online data attribute information. What MicroBilt did with it, whether they sold it *in toto* or cherry picked certain items, [is] irrelevant to us . . . . Why should they care? In going into that negotiation, why would they have cared what you did with it?

> **MicroBilt**: First no witness said that. Second, they should care because when we reach our deal, we tell them we're buying the . . . online data royalty. We're paying more. We're going to put your information in the [Merged Report] which has [other outside information and] judgments that we have to pay for . . . [s]o we're going to make a deal with you to get this better pricing so we make the money that we want to make going forward.

> . . .

> **MicroBilt**: What they did was sign off on [the Agreement] and then sent many emails [that] we point to [in] our papers. [Chex's internal emails say MicroBilt] got this more favorable pricing. [Chex is] going to take a revenue hit. This is bad news . . .

> . . .

> **MicroBilt**: When [the product] leaves MicroBilt, that's what's crucial and that was what the parties intend[ed] would drive the pricing.

(APP118-APP119)

Regarding the issue of what motivated the Parties during the negotiation of the

Agreement, the following exchange occurred between the Bankruptcy Court and counsel for

Chex:

> **Bankruptcy Court**: [A]s part of the negotiation [MicroBilt] went to Chex to say we can't afford simply to pay for an entire report because we're purchasing other information from other vendors and including this into our own report and we're going to have increased volume and because of that volume we need to pay less. Is that a reasonable interpretation of what went on?

> **Chex**: Your Honor, it would be if there was any testimony of that fact.

> . . .

14

> **Chex**: What they told Chex was – and this is the testimony that is in the record. We are going to buy FICO Expansion Score. We want to have the same pricing that FICO has. And the testimony of Mr. Bjerke and Mr. Wilhelm was very clear and consistent on that. Yes, if you're using it for the FICO reasons, the specific reasons that are in the [Agreement], you can have that pricing, otherwise you pay the other pricing [in the Debit Price Schedule].

(APP120, 71:7-72:15.)

Following the above excerpted colloquies, the Bankruptcy Court affirmed the findings in

its April 18 Opinion and held the following:

> **Bankruptcy Court**: [C]learly there are inconsistencies in the Court's view and ambiguity making the agreement difficult to apply in an even and fair manner as what the Court believes the intent of the parties were.
>
> . . .
>
> **Bankruptcy Court**: For the information resale agreement to make sense to the Court, [the Online Data Pricing Schedule], must differ from the [Debit Price Schedule] and must apply in different situations. ***The court reads this agreement as being an agreement for the resale of information. Information is the product. The product comes in two forms, a debit report and consumer report information.***
>
> I understand Chex's argument that debit report is a subset of consumer report information. The only support for that lay in the fact that it's indented a few spaces to the right under consumer report information. And frankly I'm not sure of statutory interpretative support where we look to spacing as a canon – of any type of construction.
>
> It's to this Court clear that there are two different types of products that fall within [the] information to be sold, a consumer report and a debit report with pricing for the debit report reflected in [the Debit Price Schedule] and pricing for other consumer report information in [the Online Data Pricing Schedule]. Other [consumer report] information being online data that doesn't fall within the debit report.
>
> . . .
>
> It is this Court's best effort to interpret this agreement consistent with the intent of the parties that I reach this [conclusion]. Certainly, it makes no sense to the Court for the online data royalty to be simply a subset of the debit report for that would have been – that whole section would have been included in one section. There would have been no need to break out the pricing into a debit report and an online

data royalty. The whole structure of the agreement would not make sense for there to – for it to proceed along with the arguments suggested by Chex. I do not find that this Court made any clear error of law or fact or that there is any manifest error to correct in its prior decision.

For [the] sake of clarity I'll just reiterate . . . the pricing for the debit report when that product is sold without modification, addition, or change to an end user . . . should be charged at the [rates in the Debit Price Schedule] per inquiry based on volume. When that information is cherry picked and purchased and then incorporated into a new product such as the [Merged Report] . . . the pricing in the [Online Data Pricing Schedule] will apply consistent with the Court's determination of the past.

(APP122-APP123) (emphasis added).

### 2)     Discussion

The Bankruptcy Court was confronted with two choices regarding the intent behind the drafting of the agreement. On one hand, Chex argued, and continues to argue, that the two pricing structures existed so that additional end uses of its information could be priced according to the prices it provided to Fair Issac. Essentially, once MicroBilt began to issue the Merged Report, an expanded set of end uses would be available to MicroBilt and use of the debit report information for those end uses would be priced accordingly.

On the other hand, MicroBilt argues that the Agreement was based upon a temporal understanding of how MicroBilt would be using the information. At the time the Parties entered into the Agreement, and the Merged Report was not yet being sold, the Debit Price Schedule would apply. Once MicroBilt began selling the Merged Report, however, only the Online Data Pricing Schedule would apply because, in MicroBilt's opinion, that was the pricing schedule that Fair Issac had obtained from Chex.[5] MicroBilt argued that, as the new purveyor of the FICO

---

[5] During the Motion for Reconsideration Hearing counsel for MicroBilt indicated that some small percentage of MicroBilt's customers continued to purchase debit report in the raw form, not the Merged Report. (APP119, 63:18-24.) The price MicroBilt was obligated to pay in those instances was not discussed at length.

16

Expansion via the Merged Report, it was entitled to those same rates and that the Parties agreed to such.

Each proposed interpretation fails to fully mesh with the structure and terms of the Agreement and the Pricing attachment. The Bankruptcy Court adopted MicroBilt's reasoning. This conclusion was a finding of fact and the Court is bound to uphold that determination unless it is clearly erroneous. The Court may not simply substitute its judgment in lieu of the Bankruptcy Court. However, the Court must overturn a factual determination when it is "left with the definite and firm conviction that a mistake has been committed." *U.S. Gypsum Co.*, 333 U.S. at 395. This is one of those instances. After a thorough review of the record, including the testimony before the Bankruptcy Court, the Court has concluded that the pricing terms in the Online Data Pricing Schedule only apply when the end user is engaged in the activities listed in the Online Data Pricing Schedule. All other activities not specifically enumerated in the Online Data Pricing Schedule are covered by the Debit Price Schedule.

The Bankruptcy Court made several factual determinations in its April 18 Opinion that need to be addressed. First, and as also discussed at length in the colloquy above, the Bankruptcy Court concluded that Chex sold its product to MicroBilt in "two forms, a debit report and consumer report information." (APP122, 81:3-5.) That conclusion is incorrect. Second, and directly related to the first determination, the Bankruptcy Court concluded that the applicable pricing schedule was determined by the eventual form in which MicroBilt sold the information it purchased from Chex. (APP123, 83:6-84:6.) That conclusion was also incorrect.

Regarding the first conclusion—whether Chex sold two products to MicroBilt—recourse beyond the face of the Agreement and Pricing Attachment is not required. Chex sold one product to MicroBilt: Debit Report. The Pricing Attachment clearly indicates such. (*See* APP1691.) There is no need to consult a statutory canon of construction to reasonably, and solely, infer from

17

the layout of the Pricing Attachment that the Debit Report was the sole product being sold due to the way it was nested below the "Information" and "Consumer Report Information." This is especially the case when the Pricing Attachment is read in conjunction and consistently with the Memorandum and Agreement in general.

Regarding the second conclusion—that the Online Data Pricing Schedule would apply once MicroBilt began selling the Merged Report—in sum, the four days of testimony heard by the Bankruptcy Court did not support the conclusion that the Parties intended to have a new pricing structure apply once MicroBilt began selling the Merged Report. Although the Pricing Attachment has some level of ambiguity due to its admittedly poor drafting, there is little reason evident in the Pricing Attachment to even inquire into the "intent" of the Parties. Simply stated, if the Parties had intended for the pricing schedules to be temporally based (or, based upon which *product* MicroBilt was selling, *i.e.* merely reselling debit report compared to selling the Merged Report), there would have been *some* indication of such in the Agreement or Pricing Attachment. The Agreement is devoid of anything that indicates that the *product that MicroBilt was selling* would dictate the prices. Although, as noted by both parties, the Agreement allowed for the resale of the information MicroBilt purchased from Chex to be resold in whole or modified form,[6] there is simply nothing in the Agreement that indicated that the Parties intended the form of that product to be dispositive of the pricing. In fact, the face of the Agreement and Pricing Attachment much more clearly align, on their face, with Chex's proposed interpretation of the documents: the Debit Price Schedule pricing would apply unless the specific end-users of MicroBilt's product were using the Merged Report for 1) mortgage origination, 2) installment loan origination, 3) credit card origination, or 4) direct to consumer offerings.

---

[6] *See* APP1681 § 2(c).

18

Moreover, the presence of the reporting codes is persuasive evidence that the identity of the end-user of Chex's information was dispositive of the pricing issue. Although the Parties, both in their briefs and during oral argument, disputed the extent to which the existence of the codes informed an analysis of which pricing structure applied, the Court believes Chex has the stronger argument. Chex's Debit Report Comm Specs list five relevant codes: CZ (Credit Card Issuance), DC (Debit/Credit Issuance), II (Installment Loan Issuance), MI (Mortgage Loan Issuance), and TS (Tenant Screening). (APP2035-2036.) Those codes provide a method by which MicroBilt can indicate the end-user of the Merged Report. In fact, three of those codes correspond with uses listed in the Online Data Pricing Schedule. The other two codes, DC and TS, seemingly cover uses covered in the Debit Price Schedule. The reasonable inference from the presence of these codes, while not dispositive to the Court's ruling, is that they existed to identify MicroBilt's end user of Chex's information for *billing* purposes. Furthermore, and contrary to MicroBilt's contentions otherwise, the Court does not find support in the record that indicates the codes existed solely for purposes of determining that end uses of Chex's information comported with the Fair Credit Reporting Act. Moreover, the record reveals that the Parties were aware of the codes and used them to signify the end user to which MicroBilt was reselling Chex's information. (*See* APP2316-2317.)

Accordingly, the Bankruptcy Court's determinations regarding the pricing structures are reversed and the matter is remanded for proceedings consistent with these findings. The Bankruptcy Court's decision to insert additional pricing terms into the Agreement is reversed as moot in light of the Court's determination of this issue.

**B.    The Bankruptcy Court's Determination Regarding Northway is Reversed**

**1)    The Bankruptcy Court's Determination**

Chex appeals the Bankruptcy Court's conclusion that MicroBilt had not breached Section

6(c) of the Agreement when it provided services to Northway, a customer located in Canada.

Section 6(c) states that MicroBilt:

> [M]ay only provide the Information for use by End Users in markets located in
> the fifty (50) states of the United States of America and its territories, and in no
> event shall Information be provided, used, disclosed, transmitted, or accessed in
> any other way outside of the fifty (50) states of the United States of America.

(APP1684 § 6(c).)

The Bankruptcy Court made the following finding in its April 18 Opinion:

> My understanding -- and I am accepting the debtor's position that there are no
> products delivered outside of the Continental U.S. . . . I don't know factually. I
> can't point to the record to determine if that's accurate or not. So, let me put that
> aside and I'll be glad to address it . . . at the follow-up hearing . . . .

(APP81:4-6, 14-17.)

The issue was further elaborated upon at the hearing for Chex's Motion for

Reconsideration. There, the Bankruptcy Court held that:

> I am opting against accepting Chex['s] reading of the contract [regarding the
> Northway issue]. To the extent a score is given, a decision is given by Microbilt
> to its customer and [no] information is being supplied outside of the United
> States, then there is no breach of the underlying agreement. It is only if data is
> being provided that has been purchased from Chex and that underlying data -- not
> any interpretation of the data or analysis of the data is being sold to an end user,
> there would be a breach of the underlying resale agreement.

(APP123 84:7-21.)

In essence, the Bankruptcy Court concluded that the Agreement only prohibited the sale

of the raw information supplied by Chex and not to a manipulated or massaged version of that

data. Because MicroBilt provided Northway with a score which was only based upon the

information it received from Chex, rather than passing along the raw data, the Bankruptcy Court concluded that MicroBilt has not breached Section 6(c).

### 2)   The Parties' Positions

Chex argues that the Bankruptcy Court made a legal error when it concluded that Section 6(c) would only be breached when MicroBilt supplied Northway with raw information obtained from Chex. Rather, Chex argues that "§ 6(c) of the Resale Agreement prohibits the *use of* consumer information outside the United States of America, not the mere provision [of consumer information]." (Chex Br. 44.) The *use* of that information, as part of the decision/score that MicroBilt provides to Northway, is allegedly "a clear default of § 6(c) [of] the Resale Agreement." (*Id*. at 45.)

MicroBilt contends that the only testimony adduced at trial indicated that Northway did not gain any access to the information supplied by Chex and that "MicroBilt in effect delivers 'only a decision,' a 'yes or no,' to Northway Brokers." (MicroBilt Br. 44.) MicroBilt reads Section 6(c) as only being breached when the information supplied by Chex, *i.e.* "whether a customer has made good on a check, a customer's checking account history," is provided to Northway. (*Id.* at 45.) Because no such access is afforded to Northway, Section 6(c) has allegedly not been violated.

### 3)   Discussion

MicroBilt is in breach of Section 6(c). Although the trial testimony does state that Northway is only provided with a yes/no answer regarding a credit decision it should make, that yes/no decision is directly informed by Chex's information. Section 6(c) states that "in no event shall Information be provided, *used*, disclosed, transmitted, or accessed in any other way outside of the fifty (50) states of the United States of America." Chex's information was *used* as part of the matrix of information relied upon by MicroBilt to generate the decision provided to

21

Northway. MicroBilt admitted as much during the trial. (APP404, 119:1-9.) An extended analysis need not be performed. The express language of Section 6(c) is unambiguous and MicroBilt has breached it due to the fact that it uses Chex's information as part of the mechanism by which it supplies a decision to Northway. The contrary conclusion of the Bankruptcy Court is reversed.

### C.   The Bankruptcy Court's Decision Regarding Section 20(A) is Reversed

#### 1)   The Bankruptcy Court's Determination

Section 20 of the Agreement is titled "Audit" and has three subsections. Subsection (a) states, in relevant part, that MicroBilt was to retain a certain auditor to "conduct an annual audit of [MicroBilt's] internal controls related to [MicroBilt's] compliance with the terms of [the] Agreement, including, but not limited to, Sections: 1, 2, 4, 5, 6, 7, 8, 9, 10, 17, 19, 25 and 31 hereof." (APP1687.) Subsection (a) further states: "[t]he results of all audits submitted to Chex must clearly indicate that [MicroBilt] is operating in compliance with the terms of the Agreement, each specific instance of breach must be noted." (*Id.*) Subsection (b) relates to suspension and/or termination of the Agreement for failure to comply with the Audit or its findings. (*Id.*) Subsection (c) regards Chex's right to seek credentialing information from MicroBilt about MicroBilt's "Sales Agents and/or End Users." (APP1688.)

The Bankruptcy Court, relying upon *Fleming Companies* and *Joshua Slocum*, *supra*, determined that MicroBilt's breach of the audit requirement in Section 20(a) of the Agreement was not "economically significant" or "integral to the bargain struck between the parties . . . ." (APP59-60.) The Bankruptcy Court was especially concerned with the manner in which § 20(a) allowed for the "auditor to determine compliance or breach" of the Agreement. (APP60.) The Bankruptcy Court stated that "it is not the role of the auditors to reach legal conclusions," as that

role belonged to the Court. (APP59.) As such, the Bankruptcy Court excised Section 20(a)'s requirements going forward. (APP60.)

### 2)      The Parties' Positions

Chex maintains that Section 20(a) is material to the Agreement and was improperly excised by the Bankruptcy Court. (Chex Br. 45.) That materiality, in Chex's opinion, is demonstrated by the fact that "the requirement of an annual audit was specifically noted in the Mandatory Material Terms [agreed to at the mediation], was specifically negotiated in the [Memorandum], and was specifically negotiated in the [Agreement]." (*Id.* at 45-46.) Moreover, Chex states that Mark Wilhelm's testimony demonstrates that Section 20(a) "was insisted upon by Chex because of various concerns Chex had with [MicroBilt's] compliance with the [prior agreement between the Parties]." (*Id.* at 46.) The conclusion of the Bankruptcy Court that Section 20(a) was "not economically significant or material to Chex," in its opinion, was "not supported by any citation to the record and has absolutely no factual basis." (*Id* at 47.) As such, "the Bankruptcy Court's finding is clearly erroneous and the conclusion based thereon [constituted] reversible error." (*Id.*)

MicroBilt disagrees with Chex's arguments and states that "the overwhelming evidence at trial demonstrated that the provision at issue was neither material nor economically significant to the bargain struck between Chex and MicroBilt." (MicroBilt Opp'n 46.) This is allegedly the case because "Chex never objected to the audit submitted by MicroBilt in connection with the year 2010 (which was from the same auditor and similarly did not contain a statement that MicroBilt was not in breach of the Agreement), suggesting that, indeed, Chex did not see the value in [Section 20(a)]." (MicroBilt Opp'n 47.) MicroBilt further argues that Section 20(a) has no "value" because it "requires an accountant, who is neither a judge nor an attorney, to declare whether a party is in breach of a contract." (*Id.*) Finally, MicroBilt considers Chex's attempt to

retain Section 20(a) as part of Chex's continuing efforts "to manufacture default on MicroBilt's part." (*Id.*)

### 3) Discussion

The Third Circuit has stated that a provision is "material" to a contract, and should not be lightly excised by a bankruptcy court, when it "goes to the very essence of the contract, i.e., the bargained for exchange." *Joshua Slocum Ltd.*, 922 F.2d at 1092. "[M]ateriality and economic significance" are implicated when the provision in question implicates an interest which would affect a party's "fundamental [decision] to remain in or end a contractual relationship." *Id.* For example, in *Joshua Slocum*, the provision at issue gave a landlord the right to terminate a lease if the tenant was not generating revenue above a certain amount. *Id.* at 1084. The Third Circuit found that this provision was improperly excised by the bankruptcy court because it "govern[ed] occupancy." *Id.* at 1091. Excision of such a provision ran afoul of the policy that assumption of a contract should not run roughshod over the rights of the non-debtor to receive "the full benefit of his or her bargain" with the debtor. (*Id.*)

Similarly, in *Fleming Companies*, and based upon the rationale of *Joshua Slocum*, the Third Circuit upheld a bankruptcy court's decision to deny a trustee's request to excise a provision which required that the debtor (and its eventual assignee) supply groceries to the non-debtor from a *certain* location. *Fleming Cos.*, 499 F.3d at 302. The *Fleming Companies* court noted "§ 365's attempt to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *Id.* at 306 (quoting *In re Carlisle Homes, Inc.,* 103 B.R. 524, 538 (Bankr. D.N.J. 1988)) (internal quotation marks omitted). It further stated that economic materiality should not be the only issue considered by the bankruptcy court. *Id.* "Rather, the focus is rightly placed on the importance of the term within the overall

24

bargained-for exchange; that is, whether the term is integral to the bargain struck between the parties (its materiality) and whether performance of that term gives a party the full benefit of his bargain (its economic significance)." *Id.* (citing *Joshua Slocum*, 922 F.2d at 1092.) The court gave, as examples of terms and provisions which should not be excised, a "right of first refusal" and a "time is of the essence clause." *Id.* (citing *In re E-Z Convenience Stores, Inc.,* 289 B.R. 45, 51-52 (Bankr. M.D.N.C. 2003); *In re New Breed Realty Enter. Inc.*, 278 B.R. 314, 324-25 (Bankr. E.D.N.Y. 2002)).

In the case at bar, and based upon the rationale of *Joshua Slocum* and *Fleming Companies* and the facts presented during the trial in front of the Bankruptcy Court, the Court concludes that Section 20(a) is material, economically significant and integral to Chex's benefit of the bargain it struck with MicroBilt. The Court has concluded that, similar to the provisions examined in *Joshua Slocum* and *Fleming Companies*, Section 20(a) directly impacted Chex's decision to enter into the Agreement.

Several issues must be addressed. First, and contrary to MicroBilt's arguments otherwise, Mark Wilhelm's testimony indicates that Chex viewed the audit provision as an important aspect of its agreement to remain in a relationship with MicroBilt. (*See* APP527). The record does not reveal any reason to doubt Mr. Wilhelm's credibility. Nor did the Bankruptcy Court indicate that it doubted his credibility on this issue. Second, the fact that the auditor was responsible for bringing any failings in MicroBilt's performance to Chex's attention, and alerting Chex to a possible instance of breach, does not usurp the role of any court or judicial body. For example, it would be implausible for anyone to state that Chex, acting alone and based upon its own observations, would be barred from determining that MicroBilt was not performing pursuant to the Agreement. There is no material difference when that observational capability is transferred to an auditor. No legal determination flows from the audit. It is merely a tool for Chex to

25

determine if MicroBilt is performing under the Agreement. Third, Chex's argument that the audit provision was located in the Memorandum and Mandatory Material Terms is persuasive. The Agreement contains a multitude of provisions, only some of which are reflected in the Memorandum and Mandatory Material Terms. (*See* APP1753.) Inclusion of the audit provision in those documents, which were directly negotiated during the Mediation, is a strong indication that Chex viewed the audit provision as critical to its ability to obtain the benefit of its bargain.

The ruling of the Bankruptcy Court excising Section 20(a) is therefore reversed.

## D. The Bankruptcy Court's Conclusion Regarding Data Contribution is Affirmed

### 1) The Bankruptcy Court's Determination

Section 19(a) of the Agreement states:

To the extent possible, [MicroBilt] agrees to make available to Chex at mutually agreeable time, but not less often than quarterly, and in a mutually agreeable format, certain End User account records as specified in, and in accordance with Chex's Data Contribution Policy.

. . .

Failure to contribute *fraud data* under this Agreement where it is technologically possible for [MicroBilt] to do so shall be considered a *material breach* of the Agreement and require thirty (30) days prior written notice by Chex, affording [MicroBilt] an opportunity to cure during said period prior to termination, if any.

(APP1687, § 19(a) (emphasis added).)

The Bankruptcy Court determined that the "parties' intent as expressed in the [Agreement], specifically [Section] 19(a), was that MicroBilt will contribute fraudulent check data to Chex and not that MicroBilt will be required to provide its entire database or other data – or another form of data contribution." (APP52.) The Bankruptcy Court based this determination on a finding that: "[t]here is no evidence before the [Bankruptcy Court] that the parties intended that the data contribution policy could be modified [to require] MicroBilt to contribute its entire

proprietary database of consumer reports which contains information falling well outside of the check-related [fraud] data." (APP54.) "Rather, the [Bankruptcy Court] agree[d] with the position of MicroBilt that [Section 19(a)] could only have meant that when technology changes occur, Chex could modify its data contribution policy to require MicroBilt to provide data in an updated format compatible with those changes." (*Id.*) As such, the Bankruptcy Court held that "MicroBilt is in breach for failure to provide the fraud data," which was clearly required under Section 19(a) and ordered MicroBilt to cure such default within ninety (90) days. (*Id.*) It did not consider MicroBilt in breach of a duty to supply end user account information. (APP55.)

### 2) The Parties' Positions

Chex argues that the Bankruptcy Court erred when it concluded that "contribution of end user account records was not within the parties' contemplation at the time of the execution of the [Agreement]. In addition to being contrary to the express language of the [Agreement], such a conclusion is contrary to the evidence." (Chex Br. 47-48.) Chex especially focuses on the fact that Section 19(a) only speaks to "End User account records" and "not [MicroBilt's] 'entire proprietary database;'" a distinction it argues the Bankruptcy Court conflated. (*Id.* at 48-49.) MicroBilt asserts that the express language of Section 19(a) only requires the provision of fraud data to Chex and "[i]t was not the parties' intent that the Data Contribution Policy could be modified so as to require MicroBilt information falling well outside of check-related fraud data." (MicroBilt Opp'n 48.)

### 3) Discussion

Pursuant to the express terms of the Agreement, failure to provide fraud data would clearly constitute a material breach. The Bankruptcy Court's determination in that regard, and its instruction to cure such was, therefore, correct. Whether failure to contribute end user data would constitute a breach is a closer question but one that the Court has concluded the Bankruptcy

27

Court determined correctly. As correctly framed by the Bankruptcy Court, the issue before the Court is whether a transfer of end user data "was in the contemplation of the parties when negotiating, whether it formed a part of the agreement, whether it was a material element of the agreement, and whether the parties had the intent to require such data contribution *apart* from the provision of fraud data." (APP52) (emphasis added). After a careful review of the record, the Court is satisfied that the "End User account records" requirement was not materially significant such that failure to provide such would constitute breach under the Agreement. Simply stated, the express terms of Section 19(a), and manner in which it deems failure to contribute fraud data as a "material breach" is, alone, sufficient to infer that provision of end user data was not an integral aspect of the parties' intent when executing the Agreement. The decision of the Bankruptcy Court in this regard is affirmed.

The Bankruptcy Court's April 18 Opinion and May 16 Order are AFFIRMED in part, REVERSED in part and REMANDED for the reasons stated above.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: June 26, 2013